1
2
3
4
5
6
7
8
9
10
11
12
13
14

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

GLOBAL CASH ACCESS, INC.,

Plaintiff,

v.

NRT TECHNOLOGY CORP., and NRT
TECHNOLOGIES, INC.,

Defendants.

Case No. 2:15-cv-00822-MMD-GWF

ORDER

(Defs.' Motion to Dismiss – dkt. no. 25;
Pl.'s Motion for Leave to File Sur-Reply –
dkt. no. 34.)

## I.    SUMMARY

Plaintiff Global Cash Access, Inc. alleges that Defendants NRT Technology Corp. and NRT Technologies, Inc. engaged in patent infringement and other unfair trade practices. (Dkt. no. 10.)[1] Defendants argue that the Complaint must be dismissed because the method covered in the underlying patent cannot be performed by a single entity, and because the patent claims an abstract idea. (Dkt. no. 25.) In addition to Defendants' Motion to Dismiss (dkt. no. 25), the Court has reviewed Plaintiff's response (dkt. no. 29), and Defendants' reply brief (dkt. no. 32). The Court has also reviewed Plaintiff's Motion for Leave to File a Sur-Reply (dkt. no. 34), and Defendants' response (dkt. no. 36). For the reasons discussed below, the Court will grant the Motion for Leave to File a Sur-Reply, and will grant in part and deny in part the Motion to Dismiss.

---

[1]Plaintiff filed a corrected Complaint on the same day that it initiated this action. (Dkt. no. 10.) The Court will refer to the corrected Complaint — as opposed to the first-filed Complaint (dkt. no. 1) — in this Order.

## II.    BACKGROUND

Plaintiff is the assignee of U.S. Patent No. 6,081,792 ("'792 Patent" or "'792"), which claims methods for obtaining cash from an account after a first request for cash has been denied.[2] ('792 Claims 1, 9; dkt. no. 10 at 4.) The '792 Patent is a "valuable asset" to Plaintiff's business, which involves offering "gaming products and cash access services" to gambling establishments and other institutions throughout Nevada.[3] (Dkt. no. 10 at 4.) Plaintiff alleges that Defendants compete with Plaintiff's business by selling similar products and services to the same types of establishments. (*Id.* at 7.)

Plaintiff initiated this action on May 1, 2015,[4] asserting that Defendants directly and indirectly infringe "one or more claims of the '792 Patent." (*Id.* at 8.) According to the Complaint, Defendants have infringed the '792 Patent — and continue to do so — by "making, using, offering for sale, selling and/or importing automated teller machines ("ATMs") and point-of-sale ("POS") devices and associated software," which use the methods claimed by the '792 Patent. (*Id.* at 8.) Plaintiff further claims that since November 2014, Defendants have engaged in unfair and deceptive trade practices by misleading consumers about the '792 Patent's validity, expiration date, and continued applicability in light of evolving technologies. (*Id.* at 5-6.) Defendants also allegedly made misleading statements in denying that Defendants' products infringed the '792 Patent. (*Id.* at 6.) Plaintiff claims that Defendants made such misleading statements to persuade consumers to purchase Defendants' competing products. (*Id.* at 6-7.) In light of these

---

[2]The '792 Patent is filed as dkt. no. 10 (as an exhibit to the Complaint) and dkt. no. 25-1 (as an exhibit to the Motion to Dismiss). For ease of reference, the Court will cite to the Patent itself, identifying either the relevant claims or the column and line number.

[3]Plaintiff also alleges that its products are sold worldwide. (Dkt. no. 10 at 4.)

[4]The parties have since initiated administrative review proceedings before the United States Patent and Trademark Office's Patent Trial and Appeal Board ("PTAB") and the United States International Trade Commission ("ITC"). (Dkt. nos. 43, 47.) The PTAB recently denied Defendants' petition for a covered business method ("CBM") patent review under 35 U.S.C. § 324. (Dkt. no. 43-1.) In December 2015, the ITC issued a claim construction order. (Dkt. no. 47-1.) The ITC subsequently denied Plaintiff's motion for reconsideration of the order. (Dkt. no. 47-2.) As of February 2016, Defendants were preparing a motion for summary determination in the ITC matter. (Dkt. no. 47.)

allegations, Plaintiff asserts claims for direct and indirect infringement of the '792 Patent, unfair competition, intentional interference with prospective economic advantage, and deceptive trade practices. (*Id*. at 8-14.)

Defendants now move to dismiss the Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that Defendants could not directly infringe the '792 Patent, and that the Patent is invalid. (Dkt. no. 25.) Defendants urge the Court to dismiss Plaintiff's remaining claims, which, they argue, must fail if the Court determines that the '792 Patent is invalid.

## III.   MOTION FOR LEAVE TO FILE SUR-REPLY

Before reaching the merits of the Motion to Dismiss, the Court will address Plaintiff's request for leave to file a sur-reply. This Court's local rules allow parties to file only a motion, response, and a reply brief. LR 7-2(a)-(c). A party may, however, seek leave of court to file a sur-reply addressing an issue that could not have been raised in its earlier briefing. Here, Plaintiff's sur-reply discusses a Federal Circuit decision that was issued on August 13, 2015, after Plaintiff responded to the Motion to Dismiss on July 27, 2015. (*See* dkt. no. 34-1 at 3-5 (citing *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020 (Fed. Cir. 2015)).) Given this timing, the Court agrees that Plaintiff could not have addressed the Federal Circuit's decision — which Defendants cited in their August 14, 2015, reply brief (dkt. no. 32 at 2, 3 n.2) — in its initial response brief. Plaintiff's Motion for Leave (dkt. no. 34) is therefore granted.

## IV.   MOTION TO DISMISS

### A.   Legal Standard

A court may dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A properly pleaded complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While Rule 8 does not require detailed factual allegations, it demands more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Ashcroft*

1   *v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "Factual

2   allegations must be enough to raise a right to relief above the speculative level."

3   *Twombly*, 550 U.S. at 555. Thus, "[t]o survive a motion to dismiss, a complaint must

4   contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

5   plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

6        In *Iqbal*, the Supreme Court clarified the two-step approach district courts are to

7   apply when considering motions to dismiss. First, a district court must accept as true all

8   well-pleaded factual allegations in the complaint; however, legal conclusions are not

9   entitled to the assumption of truth. *Id.* at 678. Mere recitals of the elements of a cause of

10  action, supported only by conclusory statements, do not suffice. *Id.* Second, a district

11  court must consider whether the factual allegations in the complaint allege a plausible

12  claim for relief. *Id.* at 679. A claim is facially plausible when the plaintiff's complaint

13  alleges facts that allow a court to draw a reasonable inference that the defendant is

14  liable for the alleged misconduct. *Id.* at 678. Where the complaint does not "permit the

15  court to infer more than the mere possibility of misconduct, the complaint has alleged —

16  but it has not 'shown' — 'that the pleader is entitled to relief.'" *Id.* at 679 (alteration

17  omitted) (quoting Fed. R. Civ. P. 8(a)(2)). When the claims in a complaint have not

18  crossed the line from conceivable to plausible, the complaint must be dismissed.

19  *Twombly*, 550 U.S. at 570. A complaint must contain either direct or inferential

20  allegations concerning "all the material elements necessary to sustain recovery under

21  *some* viable legal theory." *Id.* at 562 (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745

22  F.2d 1101, 1106 (7th Cir. 1984)).

23        **B.    Analysis**

24        Defendants urge the Court to dismiss the Complaint for two reasons. First,

25  Defendants insist that they could not directly infringe the '792 Patent because the

26  method it covers cannot be performed by a single entity. (Dkt. no. 25 at 8-12.) Second,

27  according to Defendants, Plaintiff's claims fail as a matter of law because the '792 Patent

28  covers a patent-ineligible, abstract idea. (*Id.* at 12-18.) Plaintiff argues that both bases

1    for dismissal are premature at this early stage of the proceedings. (Dkt. no. 29 at 6-7.)

2    Plaintiff further disputes the merits of Defendants' ineligibility argument, claiming that the

3    '792 Patent is not abstract because it improves on existing technologies by creating "a

4    tangible, new technical solution to a problem unique in the gambling sector that

5    improves upon existing ATM technology." (*Id.* at 18.) The Court disagrees — the '792

6    Patent is patent-ineligible because it is directed to an abstract idea and lacks an

7    inventive concept. *See Alice Corp. Pty. Ltd. v. CLS Bank Int'l.*, 134 S. Ct. 2347, 2355

8    (2014). Because the patent-ineligibility issue disposes of Plaintiff's patent infringement

9    claim, the Court need not reach Defendants' single-entity infringement argument.

10                   **1.    Patentable Subject Matter and the *Alice* Standard**

11             Under Section 101 of the Patent Act, an inventor may obtain a patent on "any new

12   and useful process, machine, manufacture, or composition of matter, or any new and

13   useful improvement thereof." 35 U.S.C. § 101. Courts, however, "have long held that this

14   provision contains an important implicit exception: Laws of nature, natural phenomena,

15   and abstract ideas are not patentable." *Alice Corp*, 134 S. Ct. at 2354 (quoting *Ass'n for*

16   *Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2116 (2013)). The

17   concern behind these excepted categories is "one of pre-emption" — if an inventor could

18   obtain patent protection over these "building blocks of human ingenuity," then the patent

19   scheme would work to undermine, not promote, future innovation. *Id.* at 2354. But courts

20   are careful to balance concerns over preemption with the fact that "all inventions at some

21   level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or

22   abstract ideas." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289,

23   1293 (2012). Thus, where an invention moves beyond an abstract idea by applying it "to

24   a new and useful end," the invention will meet the Section 101 standard. *Alice Corp.*,

25   134 S. Ct. at 2354 (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)).

26             In light of these competing concerns, the Supreme Court has developed a two-

27   part test to assess whether a patent covers an abstract idea. First, courts must

28   determine whether a patent's claims are directed to a "patent-ineligible concept," such as

5

1    an abstract idea. *Id.* at 2355. Second, if the court "determine[s] that the patent is drawn

2    to an abstract idea or otherwise ineligible subject matter," then the court examines

3    "whether the remaining elements, either in isolation or combination with the non-patent-

4    ineligible elements, are sufficient to 'transform the nature of the claim into a patent-

5    eligible application." *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d

6    1363, 1366-67 (Fed. Cir. 2015) (quoting *Alice Corp.*, 134 S. Ct. at 2358). Whether a

7    patent is eligible under § 101 is a question of law that may be determined at the

8    dismissal stage. *See Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*, 728

9    F.3d 1336, 1340-41 (Fed. Cir. 2013) (reviewing a § 101 determination de novo, but

10   noting that the legal issue on review "may contain underlying factual issues"); *see also*

11   *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1348-49 (Fed. Cir. 2015)

12   (affirming a district court's granting of a motion to dismiss on § 101 grounds).

13       Defendants argue that the Court should answer both questions affirmatively,

14   which would result in finding the '792 Patent invalid for claiming nothing more than an

15   abstract idea of using a separate, second transaction to obtain cash (or another item of

16   value) from a bank account after a first request and transaction to obtain the cash fails.

17   (*See* dkt. no. 25 at 12-18.) The Court will address each question in turn.

18                  **a.    No Factual Issues Foreclose the Court's Review**

19       As a threshold matter, Plaintiff insists that Defendants' ineligibility arguments raise

20   disputed factual issues and require claim construction, neither of which may be resolved

21   through a motion to dismiss. (Dkt. no. 29 at 16, 19-21.) With regard to claim construction,

22   Plaintiff refers to a document from the related ITC proceeding that identifies disputed

23   claim terms. (*Id.* at 20; *see supra* note 4.) Plaintiff relies on the disputed terms to object

24   to Defendants' characterization of the general idea covered by the '792 Patent,

25   suggesting that more specific definitions of the terms would indicate that the '792 Patent

26   is not directed to an abstract idea. (*See* dkt. no. 29 at 20, 24.) Plaintiff takes particular

27   issue with Defendants' argument that the '792 Patent covers services that a bank teller

28   could perform, like providing cash to an account-holder. (*Id.* at 19-20; *see* dkt. no. 25 at

14.) Claim construction, Plaintiff asserts, would clarify that a human could not perform all aspects of the method at issue, undermining Defendants' argument that the '792 Patent covers "the abstract idea of offering an account-holder an alternative way to obtain cash or something of value." (Dkt. no. 25 at 14.) However, as discussed below, the Court can assess whether the claims are generally directed to this abstract idea without resolving whether a human could perform all of the claimed steps. To be fair, the Federal Circuit has explained that a patent's § 101 eligibility may "depend[] on the scope and meaning of the claims." *Internet Patents Corp.*, 790 F.3d at 1348. But Plaintiff's general references to disputed claim terms fail to demonstrate that the Court cannot ascertain "the basic character of the ['792 Patent's] subject matter" without claim construction. *Id.*

Plaintiff additionally takes issue with the factual support for Defendants' assertion that account-holders have long been able to obtain cash from their banks, even with a daily limit on ATM withdrawals. (*See* dkt. no. 29 at 18-20.) Plaintiff quotes *Kenexa BrassRing, Inc. v. HireAbility.com, LLC*, No. 12-10943-FDS, 2015 WL 1943826, at *7 (D. Mass. Apr. 28, 2015), where a court in the District of Massachusetts rejected a motion for judgment on the pleadings under § 101 because the moving party relied on unsupported factual assertions about business practices. There, the defendants had created several charts to demonstrate how the allegedly abstract idea claimed by the patents at issue — which related to processing job applications — would preempt well-established business practices for reviewing job applications. *Id.* at *6. In one chart, the defendants described specific steps that a hypothetical business and university would take in reviewing an applicant's information, including populating a job application based on information in a resume, and asking the applicant to review and validate the job application. *Id.* The court reasoned that the defendants could not, at the pleading stage, offer sufficient evidence to demonstrate that those steps were actually routine business practices. *Id.* at *7. Nor could the court confirm that those practices were in use before the disputed patents were issued. *Id.*

///

Here, conversely, Defendants' characterization of longstanding practices takes cue from the '792 Patent itself, which describes well-established processes for obtaining cash from a bank account. (*See* dkt. no. 25 at 13-18 (citing '792:1:29-51).) Indeed, in describing the background of the invention, the '792 Patent states that "one can reach their ATM limit and not be able to obtain more cash that day from an ATM, but will still be able to purchase goods and services via a point-of-sale transaction because of the distinct and separate limit for point-of-sale transactions." ('792:1:43-47.) Thus, unlike the unsupported assertions in *Kenexa BrassRing*, Defendants' arguments are based on the '792 Patent's own descriptions of ubiquitous practices that existed before the patent was filed.  *See* 2015 WL 1943826 at *6-7. The Court therefore finds it appropriate to analyze the patent-eligibility of the '792 Patent at this point in the proceedings.

**b.      The '792 Patent Is Directed to an Abstract Idea**

The first step of the *Alice* test asks whether the claims at issue are directed to an abstract idea. *Alice Corp.*, 134 S. Ct. at 2355. "The 'abstract ideas' category embodies 'the longstanding rule that an idea of itself is not patentable.'" *Id.* (alteration omitted) (quoting *Benson*, 409 U.S. at 67). Even without clear guidelines defining what constitutes an abstract idea, the Supreme Court has "provided some important principles" through its § 101 jurisprudence. *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1256 (Fed. Cir. 2014). Courts should examine the claims "in their entirety to ascertain whether their character as a whole is directed to excluded subject matter." *Internet Patents Corp.*, 790 F.3d at 1346. Carrying out this analysis, the Supreme Court has identified the following ideas as abstract: the use of a mathematical algorithm for computer processing purposes, *Benson*, 409 U.S. at 65-68; the application of the "generally known idea of hedging commodities" to computer technology, *Internet Patents Corp.*, 790 F.3d at 1345 (citing *Bilski v. Kappos*, 561 U.S. 593 (2010)); and the "known practice of reducing financial risk by passing funds through a 'third-party intermediary'" to facilitate settlement, *id.* at 1346 (quoting *Alice Corp.*, 134 S. Ct. at 2356). Thus, as the ///

8

1   Federal Circuit explains, "[w]e know that some fundamental economic and conventional

2   business practices are . . . abstract ideas." *DDR Holdings, LLC*, 773 F.3d at 1256.

3          The patent at issue in *Alice* "involve[d] a method of exchanging financial

4   obligations between two parties using a third-party intermediary to mitigate settlement

5   risk." *Alice Corp.*, 134 S. Ct. at 2356. The method, as described by a claim characteristic

6   of the invention, includes a series of steps that directed an intermediary to create a

7   "shadow" record of the settling parties' financial accounts. *Id.* at 2352 n.2 (quoting U.S.

8   Patent No. 5,970,479 ("'479") Claim 33). The shadow record would be adjusted in real

9   time to reflect every transaction that resulted in a financial exchange between the two

10  parties. *Id.* The patent explained, however, that the shadow record would allow

11  adjustments "only [for those] transactions that do not result in the value of the shadow

12  debit record being less than the value of the shadow credit record at any time." *Id.*

13  (quoting '479 Claim 33). The intermediary would then "instruct[] the relevant financial

14  institutions to carry out the 'permitted' transactions in accordance with the updated

15  shadow records." *Id.* at 2352 (quoting *CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 717 F.3d

16  1269, 1285 (Fed. Cir. 2013) (Lourie, J., concurring)). The Court distilled this method

17  claim — as well as similar claims for a computer system designed to carry out the

18  method and a "program code for performing the method," *id.* at 2353 — into the general

19  idea of "exchanging financial obligations between two parties using a third-party

20  intermediary to mitigate settlement risk." *Id.* at 2356. This idea of an "intermediated

21  settlement," the Court reasoned, "is 'a fundamental economic practice long prevalent in

22  our system of commerce.'" *Id.* (quoting *Bilski*, 561 U.S. at 611). The patent was therefore

23  directed to an abstract idea. *Id.*

24         Similarly here, the '792 Patent claims a method that, on its face, is a well-

25  established economic practice. The abstract describes the purported invention as "[a]

26  method of providing money, goods, services or the like to an account-holder based on

27  an account when the daily ATM limit set by a bank has been met, or when a debit or

28  credit card [personal identification number ("PIN")] cannot be remembered." ('792

1    Abstract.) The specification focuses on the merits of easy access to cash, pointing out

2    that establishments like "casinos, nightclubs or bars" might not readily accept other

3    forms of payment. (*Id.* at 1:24.) Noting that "ATMs have become extremely

4    commonplace," (*id.* at 1:31), the specification describes a preferred embodiment that

5    employs existing ATMs to communicate with two types of networks — an ATM network

6    and a POS network — to allow an account-holder to bypass a bank's daily limit on ATM

7    cash withdrawals. (*Id.* at 4:23-6:2.) An account-holder uses an ATM to request cash from

8    his or her bank account; the ATM communicates with a processor, which forwards the

9    request to an ATM network, which, in turn, sends the request to the account-holder's

10   bank. (*Id.* at 4:32-49.) The processor also communicates with a POS network, which

11   facilitates the transfer of funds from a bank account to a vendor after an account-holder

12   purchases goods or services. (*Id.* at 4:50-64.) POS transactions typically have a

13   separate daily withdrawal limit than ATM transactions. (*Id.* at 4:64-67.)

14       If, after the account-holder requests funds through the ATM network, the bank

15   denies the request because a withdrawal limit has been met, then the ATM would either

16   ask the account-holder if he or she would like to proceed through the POS network, or

17   would automatically convert the ATM transaction into a POS transaction. (*Id.* at 5:10-22,

18   29-31.) The POS transaction would follow the same process as the ATM transaction —

19   the processor corresponds with the POS network, which, in turn, requests money from

20   the bank. (*Id.* at 5:22-28.) Finally, after the bank approves a request for cash, the

21   account-holder must obtain the cash (or another item of value) from a separate "money

22   location," such as "cash windows or 'cages' within casinos or racetracks, front desks or

23   concierges of hotels, ticket booths, will-call windows or customer service windows at

24   stadiums, coliseums, theaters, stores, or amusement parks." (*Id.* at 5:45-49.)

25       The '792 Patent includes nine claims; Claims 1 and 9 are independent, while

26   Claims 2 through 8 are grounded in Claim 1. The preferred embodiment aligns well with

27   Claim 1, which, like the representative method claim in *Alice*, broadly discloses several

28   steps required to "provid[e] money or an item of value to an account-holder." ('792 Claim

1); *see Alice Corp.*, 134 S. Ct. at 2352 & n.2 (describing several steps involved in the intermediated settlement claim).[5] Just as in the preferred embodiment, the method begins when an account is identified to a terminal, a PIN is entered, and money or another item is requested. ('792 Claim 1.) This "first type of transaction" is forwarded to a processor, then to a first network, and finally to a bank, at which point the request is denied. (*Id.*) The denial is sent back to the processor and relayed to the account-holder, who is given the option of requesting the money (or another item of value) through a "second type of transaction." (*Id.*) The second transaction follows the same steps as the first, moving to the processor, then to a second network, and finally to the bank, at which point the request can be approved. (*Id.*) After the approval is forwarded to the processor, a separate money location is instructed to provide money (or another item of value) to the account-holder. (*Id.*)

Ultimately, as the specification states, this process "allows one to obtain cash or an item of value based on a bank account when the daily ATM limit has been exceeded

---

[5]In its entirety, Claim 1 reads:
A method of providing money or an item of value to an account-holder, the method comprising:
    identifying an account to a terminal;
    entering a personal identification number into the terminal;
    requesting money or an item of value based upon the account via a first type of transaction;
    forwarding the first type of transaction to a processor;
    forwarding the first type of transaction from the processor to a first network;
    forwarding the first type of transaction from the first network to a bank;
    making a denial of the first type of transaction due to exceeded pre-set limit;
    forwarding the denial to the processor;
    notifying the account-holder at the terminal of the denial of the first type of transaction, and asking the account-holder if they would like to request the money or item of value via a second type of transaction;
    requesting money or an item of value based upon the account via a second type of transaction;
    forwarding the second type of transaction to the processor;
    forwarding the second type of transaction from the processor to a second network;
    forwarding the second type of transaction from the second network to the bank;
    making an approval of the second type of transaction;
    forwarding the approval to the processor;
    and instructing a money location separate from the terminal to provide money or an item of value to the account-holder.
('792 Claim 1.)

and it is not possible to proceed to a bank outlet to obtain the needed cash." (*Id.* at 6:45-49.) Plaintiff claims that, "[s]tripped down and simplified," this process involves "(1) obtaining money; (2) from an ATM; (3) when an account holder has exceeded the cash withdrawal limit; (4) after a first type of transaction over a first network has been denied; (5) via a second type of transaction over a second network." (Dkt no. 29 at 18.) When read alongside the '792 Patent, Plaintiff's distillation describes the abstract idea of obtaining money from a bank account through a second transaction after a first transaction fails. The '792 Patent itself indicates that this process is abstract, suggesting that ways around a bank's ATM withdrawal limit — by, for example, obtaining cash in person from a bank or using existing POS technology — are well known. (*See* '792:1:43-47, 6:45-49.) In describing these methods of obtaining cash, the '792 Patent effectively confirms that using an alternative transaction to obtain cash is a longstanding economic practice that aligns with similar commercial practices deemed abstract by the Supreme Court. *See Alice*, 134 S. Ct. at 2356. Just as in *Alice*, where the Supreme Court rejected multi-step claims that, once distilled, covered the abstract idea of an intermediated settlement, *id.*, the Court finds that the '792 Patent's claims, as a whole, are directed to the abstract idea of obtaining cash from a bank account through an alternative transaction after a first transaction fails. This satisfies the first step of the *Alice* test.[6]

///

///

///

---

[6]In January 2016, the PTAB entered an order denying Defendants' request for CBM review because, in part, Defendants had failed to show "that the claims are more likely than not patent-ineligible." (Dkt. no. 43-1 at 13.) The PTAB concluded that Defendants had "oversimplified the challenged claims" by characterizing them as being directed to "providing money to an account holder or using trial-and-error until success is achieved." (*Id.* at 12.) In the context of Defendants' Motion to Dismiss, the Court finds that Defendants have persuasively identified a distilled version of the claims at issue: "offering an account-holder an alternative way to obtain cash or something of value — i.e., when the first transaction is denied, offering to perform a second type of transaction to achieve the same results." (Dkt. no. 25 at 14.) Moreover, the Court finds that Claim 1 and the specification's description of the invention support Defendants' argument. After reviewing the parties' briefs, the claims at issue, and the '792 Patent overall, the Court disagrees with the PTAB's threshold analysis.

1

### c.      The '792 Patent Lacks an Inventive Concept

In addition to demonstrating that the '792 Patent is directed to an abstract idea, Defendants must show that the Patent lacks an "inventive concept." *Alice Corp.*, 134 S. Ct. at 2357. "This second step is the search for . . . some element or combination of elements sufficient to ensure that the claim in practice amounts to 'significantly more' than a patent on an ineligible concept." *DDR Holdings, LLC*, 773 F.3d at 1255 (quoting *Alice Corp.*, 134 S. Ct. at 2355). This inquiry is "analogous to those undertaken for determination of patentable invention[s], for a known idea, or one that is routine and conventional, is not inventive in patent terms." *Internet Patents Corp.*, 790 F.3d at 1346.

After examining several past cases involving patent-ineligible subject matter, the *Alice* Court concluded that "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice Corp.*, 134 S. Ct. at 2358. For example, in *Mayo Collaborative Services*, 132 S. Ct. at 1294-95, the Supreme Court invalidated a method patent designed to assess the efficacy of a drug by administering the drug, testing the levels of the drug in a patient, and then determining whether to increase or decrease the dosage amount in subsequent administrations. After finding that the method claimed laws of nature, the Court went on to hold that the method's several steps instructed physicians to apply those laws of nature using "well-understood, routine, conventional activity engaged in by the scientific community." *Id.* at 1298. Similarly, in both *Benson* and *Parker v. Flook*, the Court held that applying an abstract idea — an algorithm in *Benson* and a mathematical formula in *Flook* — to a computer created no inventive concept because computers could carry out those basic processes long before the alleged inventions were patented. *See Alice Corp.*, 134 S. Ct. at 2357-58 (citing *Benson*, 409 U.S. at 64, 67 and *Parker v. Flook*, 437 U.S. 585-86, 593-94 (1978)). *But see Diamond v. Diehr*, 450 U.S. 175, 187 (1981) (holding that a patent employing a known mathematical formula as part of a larger process for curing rubber was patent-eligible).

///

1    Applying this reasoning to the separate method claims at issue in *Alice*, the Court

2    found that using a computer to carry out an intermediated settlement was "purely

3    conventional." *Alice Corp.*, 134 S. Ct. at 2359 (alteration omitted) (quoting *Mayo*, 132 S.

4    Ct. at 1298). Computers were entirely capable of the "electronic recordkeeping" called

5    for by the claims; they could also "obtain data, adjust account balances, and issue

6    automated instructions." *Id.* Because the Court construed these activities as mundane

7    computer functions, the fact that a computer appeared in the claims did not create an

8    inventive concept. *Id.* Moreover, when analyzing the combination of steps that made up

9    the method claim, the Court held that the steps failed to "improve the functioning of the

10   computer itself" or "effect an improvement on any other technology or technical field." *Id.*

11   Because the addition of a computer did not "transform an abstract idea [of an

12   intermediated settlement] into a patent-eligible invention," the Court found the patent to

13   be invalid under § 101. *Id.* at 2360.

14   Plaintiff insists that the '792 Patent improves existing ATM technologies in casinos

15   by instructing one terminal to perform two different transactions to obtain cash. (Dkt. no.

16   29 at 21, 23.) Absent this method, Plaintiff argues, an ATM would not allow an individual

17   to obtain cash if he or she had exceeded the relevant withdrawal limit. (*Id.* at 23.) Plaintiff

18   further argues that, in contrast to other vague business method patents, the '792 Patent

19   explains exactly when and how to perform the allegedly inventive step of using a second

20   type of transaction to obtain cash. (*Id.* at 25.) So did the patent at issue in *Mayo*. There,

21   doctors were instructed when to test a drug's effectiveness (after its administration) and

22   how to measure its effectiveness (by determining the drug's levels in a patient's blood

23   and comparing them to a defined threshold). *See Mayo*, 132 S. Ct. at 1295, 1297-98.

24   Here, similarly, the '792 Patent discloses that the second transaction will occur after the

25   first is denied, and that the second transaction is carried out by a processor that forwards

26   the second request to a second network. ('792 Claim 1.) The second transaction ends by

27   making cash available at a separate money location, not at the initial terminal. (*Id.*)

28   ///

1    As explained in the specification, such separate transactions existed well before

2    the claimed invention. Individuals unable to obtain cash from an ATM would "still be able

3    to purchase goods and services via a point-of-sale transaction," (*id.* at 1:43-47), or could

4    "proceed to a bank outlet to obtain the needed cash." (*Id.* at 6:48.) Even though the '792

5    Patent claims to improve these existing processes, (*see id.* at 1:58-61), the claimed

6    steps simply disclose that a second transaction occurs after a first is denied, and, just as

7    where an account-holder needs to visit his or her bank outlet, requires an account-holder

8    to obtain the cash from a separate location. (*Id.* at Claim 1.) In short, contrary to

9    Plaintiff's assertions, Claim 1 does not enable an account holder to obtain cash from an

10   ATM through a second transaction. (*See* dkt. no. 29 at 23.) Transposing these existing

11   processes into a single terminal does not elevate them from "well-understood, routine,

12   conventional activit[ies] already" used to obtain cash. *Mayo*, 132 S. Ct. at 1298.

13   Finally, Plaintiff urges the Court to apply the "machine-or-transformation test," an

14   analysis considered by the Supreme Court to be "a useful and important clue, an

15   investigative tool, for determining whether some claimed inventions are processes under

16   § 101." *Bilski*, 561 U.S. at 604. Despite its potential utility, machine-or-transformation test

17   is not the exclusive means of assessing whether a patent is valid under § 101. *Id.* The

18   test asks whether a claimed process (1) "is tied to a particular machine or apparatus," or

19   (2) "transforms a particular article into a different state or thing." *Id.* at 602 (quoting *In re*

20   *Bilski*, 545 F.3d 943, 954 (Fed. Cir. 2008)). But "the use of a specific machine or

21   transformation of an article must impose meaningful limits on the claim's scope to impart

22   patent-eligibility." *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1332 (Fed. Cir.

23   2010) (quoting *In re Bilski*, 545 F.3d at 961). A machine cannot impose such limits

24   unless it "play[s] a significant part in permitting the claimed method to be performed." *Id.*

25   at 1333. Merely "permitting a solution to be achieved more quickly" is not enough. *Id.*

26   Plaintiff views the '792 Patent as "an enhancement of the ATM itself rather than a

27   financial transaction employed on it." (Dkt. no. 29 at 23-24.) Claim 1 appears to disclose

28   the opposite — the method is carried out on a terminal, which communicates with a

15

1  processor, which, in turn, can interact with two separate networks. ('792 Claim 1.) It is

2  not clear how the claim improves the ATM itself; instead, the method discloses using an

3  ATM (more precisely, a "terminal") as a starting point for carrying out two different

4  requests for cash. (*Id.*) Rather than improving the functionality of an ATM (or a different

5  type of terminal), Claim 1 uses the terminal to allow an account-holder to obtain cash

6  more quickly and conveniently. *See SiRF Tech.*, 601 F.3d at 1333. Furthermore, Claim 1

7  still requires an account holder to obtain the cash or item of value from a separate

8  money location. Despite Plaintiff's assertions, the Court finds that the terminal does not

9  play a transformative or significant role in allowing the method in Claim 1 to be

10  performed. Thus, even after applying the machine-or-transformation test, the Court finds

11  that Claim 1 lacks an inventive concept required for patent eligibility.

12      Because the claims of the '792 Patent are directed to the abstract idea of using

13  an alternative transaction to obtain cash or another item of value from a bank account

14  after a first transaction fails, and because the claims lack an inventive concept, the Court

15  finds that the '792 Patent is patent-ineligible under § 101. The Court accordingly

16  dismisses Plaintiff's patent-related claims.

17              **2.    Plaintiff's Remaining Claims**

18      Defendants argue that Plaintiff's remaining claims for unfair competition,

19  intentional interference with prospective economic advantage, and deceptive trade

20  practices cannot survive a finding that the '792 Patent is patent-ineligible. (Dkt. no. 25 at

21  19-20.) According to Defendants' logic, if the '792 Patent is patent-ineligible, then any

22  alleged misrepresentations about infringement, validity, or the strength of the Patent in

23  light of changing technologies were not, in fact, misleading. (*See id.*; dkt. no. 32 at 20.)

24  The Court disagrees.

25      First, Plaintiff's allegations are broad enough to cover statements unrelated to the

26  '792 Patent's validity. (*See, e.g.*, dkt. no. 10 at 11 (asserting that Defendants made

27  misrepresentations about "the nature, characteristics and qualities of [Defendants']

28  products and services, as well as the nature, characteristics and qualities of the products

and services offered by [Plaintiff]").) Second, the parties have not fully briefed whether assertions about a patent's invalidity that are later confirmed by a court order can give rise to claims of unfair competition, intentional interference with prospective economic advantage, and deceptive trade practices. Defendants' alleged misrepresentations were necessarily made before the Court held that the '792 Patent is patent-ineligible under § 101. The Patent Act, moreover, dictates that patents are "presumed valid." 35 U.S.C. § 282(a). Thus, if the '792 Patent was presumptively valid at the time that Defendants made the alleged misrepresentations, it is not clear that today's ruling would undermine Plaintiff's remaining claims. The Court therefore denies the Motion to Dismiss with regard to Plaintiff's claims of unfair competition, intentional interference with prospective economic advantage, and deceptive trade practices.

## V.    CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion or reconsideration as they do not affect the outcome of Defendants' Motion.

It is therefore ordered that Plaintiff's Motion for Leave to File a Sur-Reply (dkt. no. 34) is granted.

It is further ordered that Defendants' Motion to Dismiss (dkt. no. 25) is granted with respect to Plaintiff's patent infringement claim, but denied with regard to the remaining claims.

DATED THIS 25th day of March 2016

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE